114    581
f125     51

LEWIS *v.* WEIDENFELD.

1. APPEAL—FEDERAL COURTS—REMANDING OF CAUSES — REVIEW.
   The action of a Federal court in remanding a cause to a State
   court is not reviewable on appeal from a final decree there-
   after rendered in the State court.

2. NONRESIDENT DEFENDANTS — ORDER OF PUBLICATION — SUFFI-
   CIENCY.
   An order of publication requiring a nonresident defendant
   to "appear and answer the bill of complaint within four
   months from the date of this order" is sufficient, under 3
   How. Stat. § 6671, which provides that, if the defendant is a
   resident of some other of the United States, the order shall
   require .him to "appear and answer in not less than four
   months;" it being unnecessary that the order should fix a
   specific day for the appearance.

3. CONTRACTS — EXECUTION—AGENT ACTING AS PRINCIPAL—PAROL
   EVIDENCE.
   One who, in his individual capacity, executes a contract of
   purchase, and gives back a purchase-money mortgage con-
   taining no reference to representative capacity, cannot show
   by parol evidence, to avoid liability for a deficiency on fore-
   closure of the mortgage, that he was acting, to the knowledge
   of the mortgagee, as agent of others interested with him, with
   the intention of conveying to them the property purchased.

4. MORTGAGES—ADDITIONS AND IMPROVEMENTS — EXTENT OF LIEN.
   The lien of a mortgage covering all the property and fran-
   chises of a gas company, together with "all improvements and
   additions, of every name and nature," extends to a new
   municipal franchise obtained in place of that belonging to
   the mortgagor at the time of the execution of the mortgage.

5. SAME—DEFENSES TO FORECLOSURE — MISREPRESENTATION — EVI-
   DENCE.
   Upon a review of the evidence adduced in foreclosure pro-
   ceedings, *held*, that the mortgagees were not guilty of mis-
   representation as to the extent of corporate assets for the
   purchase price of which the mortgage in suit was given.

6. Corporations—Sale of Franchise—Limited Privilege—Notice to Purchaser—Failure to Examine Records—Estoppel.

> It is incumbent upon a purchaser of the franchise of a gas
> company organized to supply gas to a given city, which
> franchise, by its terms, is notice that certain of its essential
> features are limited to a period of time which has elapsed at
> the time of the purchase, to examine the records at hand for
> the purpose of discovering what new arrangements were
> made with the city at the expiration of such period, and if
> he fails, through no misrepresentation of the seller, to make
> such examination, he is estopped from complaining that certain corporate privileges, which he believed to be perpetual,
> were limited by subsequent agreements.

Appeal from Wayne; Carpenter, J. Submitted October 1, 1897. Decided October 25, 1897.

Bill by Alexander Lewis and Jerome Croul, trustees, against Camille Weidenfeld, the Detroit Gas Company, and the New York Guaranty & Indemnity Company, to foreclose a mortgage. From a decree for complainants, defendants appeal. Affirmed.

July 5, 1892, the following instrument was executed between the Detroit Gaslight Company, of Detroit, Mich., and Camille Weidenfeld, of the city of New York:

"*Whereas*, said second party is desirous of purchasing so much of the property of said first party as is used for the purpose of making and distributing gas, and is also desirous of acquiring all of the capital stock of said first party, and has offered the said first party the price and terms therefor hereinafter named, and the directors of said first party deem it wise and best for the interests of the stockholders of said first party that such sale be made; and—

"*Whereas*, in order to consummate such transaction it will be necessary to obtain the assent of all the stockholders of said first party:

"Now, therefore, said first party agrees that it will, as soon as practicable, present the said proposition to its stockholders, and use reasonable efforts to obtain the authority of all of them to the sale of said property and stock, and, if successful in such efforts, to notify the said second party, within 90 days from the date hereof, of its

readiness to carry out the sale aforesaid. And, upon re-
ceiving such power and authority from its stockholders,
said first party agrees to sell, by good and sufficient con-
veyance, to said second party and his associates, or to
such person or corporation as he may designate:

"*First.* All its property, rights, privileges, and fran-
chises which pertain to and are used in the manufacture,
distribution, and sale of illuminating gas (a portion of the
property of said first party, commonly known as its 'sur-
plus,' consisting of all bonds, mortgages, stock, cash, and
all evidences of debt held by said first party, and two par-
cels of real estate, one being in Sanilac county, and the
other being on the corner of Sixth and Congress streets,
in Detroit, and which property has no direct connection
with the making or distributing of such gas, not being
included in this sale).

"*Second.* All of the capital stock of said first party,—all
for the price, and on the terms, and in the manner herein-
after stated:  All of the said property is to be free and
clear from all liens and incumbrances, of every name and
nature, except as follows:  The upper floor of the office on
Congress street is under lease to Allan Sheldon, and the said
second party is to assume and carry out a certain contract
now in force made by said first party, providing for the
sale of its ammoniacal liquor, as well as all contracts exist-
ing at the time of the transfer for the purchase of coal or
other supplies: *Provided*, that the sale of such property
shall be on the express condition that the purchasers shall
continue to supply illuminating gas to the city of Detroit
and its inhabitants in the same manner as the said first
party is now required to do: *Provided, further*, that if
such assent, ratification, and authority from such stock-
holders be not obtained within 90 days from the date
hereof, this agreement becomes void and of no effect, at
the option of the party of the second part, to be declared
within 30 days after the expiration of said period of 90
days, and he shall have the right to purchase the holdings
of the stockholders so assenting for a *pro rata* proportion
of said purchase money; and in any event the party of
the second part shall have no cause of action against the
party of the first part for its failure to obtain the assent,
ratification, and authority of all of said stockholders.

"And, in consideration of the premises, the said second
party agrees to purchase the said property and stock, and
to pay therefor the sum of one million four hundred and
fifty thousand ($1,450,000) dollars, in manner following:

Four hundred and fifty thousand ($450,000) dollars within 10 months after receipt of notice of the authority given by said stockholders as aforesaid, five hundred thousand dollars on or before one year from the date of such first payment, and five hundred thousand dollars on or before two years from the date of such first payment; such deferred payments to bear interest at the rate of 6 per cent. per annum, payable semi-annually until paid, and to be secured by a purchase-money mortgage upon the property so transferred, executed by said second party to such persons as said first party shall designate to hold the same as trustees for the stockholders of said first party. Such mortgage shall contain the usual interest clause contained in the long-form real-estate mortgage in common use in this State.

"Concurrently with the payment by the party of the second part of said first payment of four hundred and fifty thousand dollars, and the execution and delivery of said purchase-money mortgage, the said party of the second part shall be entitled to, and shall be put into, possession of said property and stock; and the board of directors of said party of the first part shall at once hold a meeting of the said board of directors, and severally resign as such directors, and, as each resignation shall be accepted, the remaining members of said board shall elect such person to fill the vacancy as shall be named by the party of the second part, and continue so to do until all of said directors shall be persons designated by said party of the second part. The party of the second part shall have the right to make or cause to be made, at any time, additions, betterments, or improvements to the plant or other property of said party of the first part, the party of the second part forfeiting all claim thereto in case he shall not finally conclude the purchase herein provided for.

"As the said first party, at the time of such transfer, may have on hand coal, coke, tar, ammonia, and other supplies and residuals, which are not to pass by such transfer, it is understood that the second party may take the same at the cost of the coal and the market price of the residuals.

"All money on hand and accounts due to said first party at the time of the transfer shall be retained by the said first party, and transferred by it to trustees for the benefit of its stockholders.

"It is intended and understood that the property of said first party not expressly transferred hereby, and the pur-

chase money aforesaid, shall be by said first party, prior
to the transfer of its capital stock to said second party,
transferred to certain persons, to be designated by said
first party (presumably, the persons named in said mort-
gage as trustees), to hold the same for division and distri-
bution among the stockholders of said first party author-
izing the sale of such stock; and, whenever the word
'stockholders' is used herein, the stockholders authorizing
such sale of stock to said second party are the ones meant,
and not such as may be stockholders after such transfer."

The board of directors authorized the execution of this
instrument. Immediately thereafter the proposition was
communicated to the stockholders, a majority of whom
were nonresidents of this State. The number of shares
was 20,000. All but 89 shares assented to the contract
and the sale of their stock. These shares were held by
two persons who were absent from this country at the
time, and could not be reached. The situation was com-
municated to Mr. Weidenfeld, and October 27, 1892, he
sent to the Detroit Gaslight Company the following com-
munication:

"*Gentlemen:* I beg to acknowledge the receipt by me
of your notice bearing date October 3, 1892, pursuant to
a certain agreement, dated July 5, 1892, between the
Detroit Gaslight Company and Camille Weidenfeld,
which notice is to the effect that stockholders represent-
ing all of the stock of said Detroit Gaslight Company,
except 89 shares, have assented to the transfer of the
stock and property of the company under said con-
tract, and that said 89 shares are held by two stock-
holders who have been absent from the country, and
whom the company has not been able to consult: Now,
therefore, this is to notify you that I, the undersigned,
hereby declare the option given to me in and by the pro-
visions of said contract, and hereby elect to purchase the
holdings of the stockholders of said Detroit Gaslight Com-
pany assenting to the terms of said contract for the *pro
rata* proportion of the purchase money therein named."

After this the contract was completed by the proper
conveyances, $450,000 paid, and a mortgage executed for
$1,000,000, the balance of the purchase price, to complain-

ants, Croul and Lewis, and Mr. Charles B. Lothrop. The parts of the mortgage material to this controversy are those describing the property mortgaged, and are as follows:

"(3) All the property which was used by the Detroit Gaslight Co., a corporation, in the manufacture of illuminating gas, and situated at the gasworks on the parcel of land numbered 1 above. All office fixtures, furniture, and other property in the office or shop of the said Detroit Gas Company upon said parcel of land above described, numbered 2.

"(4) All gas mains, pipes, meters, and other appliances which were lately owned by said Detroit Gaslight Company, and used by it in and about its business of distribution and sale of gas.

"(5) All the rights, franchises, contracts, ordinances, and privileges which belong to said gaslight company to make, distribute, and sell illuminating gas within the city of Detroit, Wayne county, Michigan. All of the above being the same property this day, and concurrently herewith, sold by the said Detroit Gaslight Company to said first party, and this mortgage being given to the said second parties to secure a portion of the purchase price of such sale.

"(6) Also, all improvements and additions, of every name and nature, made by said first party, his heirs and assigns, to the aforesaid plant and apparatus for making and distributing gas, while any part of the money secured hereby remains unpaid."

Defendant Weidenfeld conveyed the property to the defendant the Detroit Gas Company, which about the same time purchased all the property, rights, and franchises of the Mutual Gas Company, thus effecting a consolidation of all the gas companies of the city, and giving the Detroit Gas Company a monopoly of the business. Subsequently the city commenced suit against the Detroit Gas Company, attacking the validity of the consolidation, denying the right to lay pipes across Woodward avenue to connect the lines of the Detroit Gaslight Company and the Mutual Gas Company, and praying for an injunction.

The defendant gas company paid the installments of

interest as they became due, till and including March 1, 1895; accompanying the payments with letters asserting what it now urges as a defense, and that the payments were made without any intention to waive any rights which it possessed. When the principal became due, the defendant gas company refused to pay, and complainants filed this bill to foreclose. Weidenfeld was made a party because he was the original contractor, and is claimed to be liable for any deficiency that may exist upon the sale of foreclosure. The New York Guaranty & Indemnity Company is made a party as a subsequent mortgagee.

The main defense is that complainants and Charles B. Lothrop, their co-trustee, who is now deceased, made certain representations as to the rights of the Detroit Gaslight Company in the streets which were material, were false, were relied upon, and entailed damage. The position of the defendant gas company, stated in the language of its counsel, is as follows:

"The Detroit Gas Company declined to pay the mortgage held by complainants in trust, and resists foreclosure, because the Detroit Gaslight Company failed to deliver, and the Detroit Gas Company has never received, the street rights which the Detroit Gaslight Company represented it possessed, and which were to be part of the property sold, and were a large part of the consideration which fixed the amount agreed to be paid. For the loss by reason of the part failure in consideration the defendant Detroit Gas Company prays by cross-bill that the mortgage be canceled, or reduced so that, with the $450,000 cash payment, it will equal the true value at the time of the sale of the property actually conveyed."

The case was duly put at issue, heard on pleadings and proofs, and decree entered for the full amount of the mortgage and interest.

The Detroit Gaslight Company was incorporated by a special act of the legislature March 14, 1849, and its corporate existence limited to 50 years. The preamble and first section of the act are as follows:

"*Whereas*, certain persons have associated themselves under the style of 'The City of Detroit Gas Company,'

for the purpose of carrying on and establishing in said city of Detroit a gas manufactory of the kind now generally used, or any improved gas or inflammable substance, and of supplying the citizens with gas who desire the same, at rates to be agreed upon; the following being the names of the persons who have signed the articles of association and taken shares of stock: * * * and *Whereas*, the common council of said city have given the necessary permit to said association to locate said establishment in said city, and to run their pipes through the streets of the same, and have given them the exclusive privilege so to do for the period of 10 years, on certain conditions and under certain restrictions, as appears by an agreement in writing signed by a committee of said council, dated September 29, 1848, and approved by said common council, and to which reference is hereby had; and *Whereas*, said persons have applied to this legislature to be incorporated, the more effectually to enable them to accomplish the said objects of their organization:

"Section 1. Be it enacted by the senate and house of representatives of the State of Michigan, as follows, to wit: That said persons above named, who have signed said articles of association, and all such other persons as shall become stockholders and associated with them for said purpose, and their successors and assigns, shall be and hereby are constituted and declared to be a body politic and corporate, under the name and style of 'The City of Detroit Gas Company,' for the objects and purposes contemplated and stated in the above preamble, for the period of 50 years from and after the passage of this act: *Provided always*, that within the period of one year they commence operations, and continue the same with all reasonable despatch." Act No. 82, Laws 1849.

Subsequently the charter was amended by the legislature by changing the name of the corporation, and extending the time for the construction of the plant.

In 1851 the city and the City of Detroit Gas Company entered into an agreement by which the right was granted to the company to run its pipes through and to such portions of the city as it might desire, or as might be necessary to supply gas to its citizens. It then gave an exclusive grant to the company, for 10 years, to manufacture and vend gas in the city. In 1861 another agreement

was made by which the privilege and right to lay underground pipes in the streets, etc., was granted to the gas company, and the gas company agreed to extend its pipes through the streets of the city to the House of Correction, to put down pipes, and furnish gas to citizens and residents · at $2.50 per 1,000 cubic feet. The city also agreed to take gas for its use at a certain price named. It was also expressly therein agreed that the gas company should have, hold, use, and enjoy the right and privilege granted for its use by the city from the 1st day of June, 1861, to the 1st day of June, 1866. No other agreements were entered into, although negotiations were had to that end, but the gas company continued to extend its mains in the streets and to supply gas to residents until it sold out to Weidenfeld. At this time it had laid in the streets 63 miles of mains, while in 1861 it had laid only 27 miles.

During the pendency of the suit above mentioned, brought by the city, attacking the rights of the Detroit Gas Company, the city and that company effected a settlement, and a new franchise was granted to the company, extending over a period of 30 years, and reducing the price of gas to one dollar. No notice was given either to the complainants or to the Detroit Gaslight Company to defend that suit. It was not a party to it; neither did the Detroit Gas Company consult with complainants or the Detroit Gaslight Company in regard to its new franchise and agreement with the city. Other facts, so far as they are essential, will be stated in connection with the points raised.

*Cutcheon, Stellwagen & Fleming* (*Edwin F. Conely* and *C. A. Kent*, of counsel), for complainants.

*Brennan, Donnelly & Van De Mark,* for defendant Weidenfeld.

*Wells, Angell, Boynton & McMillan,* for defendant Gas Company.

*Miller, Peckham & Dixon,* for defendant Guaranty Company.

GRANT, J. (*after stating the facts*).  1. Defendant Weidenfeld appeared specially, and moved to remove the case to the United States court.  The State court granted the order.  The United States court, upon motion, remanded the case to the State court.  It is now insisted that this order of the United States court was erroneous, and that the State court has no jurisdiction in the cause. This question is settled by the Supreme Court of the United States in *Missouri Pacific R. Co.* v. *Fitzgerald*, 160 U. S. 556.  The court in that case say, "If the circuit court remands a cause, and the State court thereupon proceeds to final judgment, the action of the circuit court is not reviewable on writ of error to such judgment."

2. Defendant Weidenfeld was a resident of the State of New York.  Personal service could not, therefore, be had. Complainants made an affidavit setting forth the necessary facts, and an order of publication was made under the statute.  The order required Weidenfeld and the New York Guaranty & Indemnity Company, also a nonresident, to "appear and answer the bill of complaint within four months from the date of this order."  After the case had been remanded, Weidenfeld appeared specially, and moved to set aside this order as insufficient and void.  3 How. Stat. § 6671, provides that, if the defendant is a resident of some other of the United States, the order shall require him "to appear and answer in not less than four months." The order *pro confesso* was not entered until after the expiration of the four months.  The point raised is that the order should fix a day for the appearance of the defendant, and that that day must be four months or more from the date of the order.  The order gave the defendants the benefit of the entire four months, and the order *pro confesso* could not be entered, under its terms, until the expiration of the entire time.  It could mislead no one.  It furnished all the notice that it could by fixing a day certain.  It is not indefinite.  It is not necessary that the order should fix a specific day.  It is in the usual form prescribed by the authorities.  Jenn. Ch. Prac. 743,

744. The consequence of disturbing old and settled forms of practice is well stated in *Pettiford* v. *Zoellner*, 45 Mich. 358.

3. Defendant Weidenfeld, after the above motion was overruled, appeared and answered, and it is now urged that he is not personally liable for any deficiency which may arise after the foreclosure sale. The contention of his counsel is that complainants knew that he was acting as agent for others, and not for himself personally. The obvious reply to this is that he chose, by the express terms of his contract, to make himself personally liable. It is of no consequence that complainants knew that others were interested with him, or that he was acting with the intention of conveying the property to others. The law does not permit him to escape an express personal liability by showing that he was acting for others. The stockholders were parties to this agreement. If they did not consent to sell their stock under the terms of the agreement which was submitted to them, the contract failed and became inoperative. There is no evidence that the stockholders were informed that Weidenfeld was acting as agent, and not as principal. The injustice, therefore, of relieving him from personal liability, is apparent. This is a case where parol evidence is inadmissible to change the plain and express terms of a written contract. Mechem, Ag. § 443. Defendant Weidenfeld is therefore personally liable.

4. It is urged that the complainants have only a lien upon the property actually transferred by the Detroit Gaslight Company to Weidenfeld, and that it does not cover the additions which have since been made, and the new franchise which the defendant Detroit Gas Company obtained from the city. To uphold this contention would be to fly in the face of the explicit and express terms of the mortgage, viz., that it covered " all improvements and additions, of every name and nature." This covers the entire property,—as well that to be added as that conveyed. It might as well be contended that when A. buys

land, and gives back a mortgage for the purchase price, with the express stipulation that it shall cover all improvements, a house erected thereon, and a part of the realty, is not covered by the mortgage. We may fairly conclude that a reasonable and prudent man foresaw what has happened, and provided against it. It was contemplated that the property of the three companies should be 'united into one. The defendant gas company asserts in its answer that such a consolidation was understood and intended. The property of the three companies was to be mingled, their pipes united, and their plants consolidated. The difficulty in separating the property after years of use by the new company is apparent. Furthermore, the charter of the old company had but between six and seven years to run. Naturally, the new company would be seeking, and might at any time obtain, a new franchise. The new company did, in fact, without any notice to or consent of the old company, wipe out all the rights in the streets and the franchises which the old company had, by entering into a new agreement with the city, and accepting a new ordinance for 30 years. The new company, therefore, has not the franchise which it purchased and mortgaged, to be reconveyed on the foreclosure sale. Further argument on this point is unnecessary. The mortgage covers all additions of every kind, and also the new franchise obtained by the defendant gas company in place of the old franchise.

5. Were material representations of fact made by Croul, Lewis, and Lothrop, which were false, and upon which Weidenfeld relied in making the contract? This question presents the only controversy of fact in the case. Briefly stated, the representations, as claimed by the defendants, are that the Detroit Gaslight Company was operating under the contract of 1851, and that under it the rights of the company in the streets were perpetual. Owing to the importance of the case, on account of the large amount involved, we will refer to the testimony somewhat in detail. The negotiations which resulted in the sale were

commenced in an informal way, in Detroit, in conversations between Messrs. Croul and Lewis and Mr. Frank P. Byrne. These conversations are unimportant. They resulted in an interview in New York city, at the office of Mr. Weidenfeld, between Messrs. Lewis and Croul and Messrs. Weidenfeld, John Byrne, and Frank S. Smith, on April 7, 1892. Mr. Weidenfeld testified:

"My recollection is that Mr. Croul based the negotiations on the contract of 1851. He said that the rights claimed to be granted by that agreement certainly endured until 1899. I don't think he said anything as to the perpetual character of the franchise."

On cross-examination he testified that he did not know when or where that statement was made, or whether it was in Detroit or New York. He also testified that his recollection was that the contract of 1851 was sent to him as the franchise of the company. If this was so, it was evidently after a copy of it was obtained from Mr. Lothrop, as hereinafter referred to.

Mr. John Byrne testified:

"Mr. Lewis stated that they had valuable rights in the streets, and that they considered them perpetual. Either Weidenfeld or I asked, 'Well, what are those rights?' Mr. Croul said, laughing, he believed he had the only copy of the contract of 1851, and considered it very valuable."

It appears from his cross-examination that no copy of this contract was then produced by Lewis or Croul, and that witness did not see one till subsequently, when it was sent by Mr. Donnelly, of Detroit, to Mr. Smith, one of the attorneys for defendants, at New York, and was the copy he had obtained from Mr. Lothrop.

Mr. Smith testified that he had no conversation with Mr. Lewis on the subject, but that Mr. Croul, after stating to him the price which they were entitled to charge, and in reply to the question for how long a time they would enjoy that right, said:

"They had it absolutely for seven years, which was the time within the unexpired duration of their right to be a corporation, and that, if the street-railway company succeeded in its litigation with the city, that right could be passed on to the new company, and was perpetual, because it was based upon a perpetual contract which had been given to the company about the year 1851."

Mr. Frank P. Byrne testified to a conversation with Mr. Croul, in Detroit, early in the negotiations. His version of that conversation is as follows:

"I asked him as to the franchise of their company, and I remember his reply: It was all right; that they had practically— What was the expression now? Well, unlimited rights in the streets. And then he told me, laughingly, that the city was really at the mercy, or in a hole, as he expressed it, on that subject, as it had no copy of the franchise or contract, whatever it might be, with their company; and he explained to me that the secretary of the gaslight company at or about the time the franchise was granted was a methodical sort of a fellow, and had copied the whole thing into the record book of the gaslight company, and that was the only copy in existence."

This witness made the arrangement for the meeting in New York. He testified to a subsequent conversation in Detroit with Mr. Lewis, in which he stated to Mr. Lewis that they considered the price too high, to which Mr! Lewis replied:

"Your brother don't give sufficient importance to the value of our rights or franchise from the city, which are perpetual."

The above is the substance of the representations upon which the defendants claim to have relied. Mr. Lothrop made no representations, except to state to Messrs. Donnelly and Wells, who were acting as attorneys for the proposed purchasers, that the contract of 1851 was the only contract which he knew anything about. This was in reply to an application from them to Mr. Lothrop for such information as he (Lothrop) could give with reference to the street rights, or the arrangement with the city.

These representations were absolutely and positively denied by Messrs. Croul and Lewis. They also testified that, at the time of these interviews, they did not know of the existence of the contract of 1851 or that of 1861. No claim is made that either Croul, Lewis, or Lothrop had any knowledge of the existence of the contract of 1861. That was not discovered by any one until after the institution of the suit by the city against the defendant gas company. If any such representations were made, they were not communicated to the attorneys in Detroit acting for Weidenfeld and his associates, for on May 31, 1892, their attorneys, Brennan, Donnelly & Van De Mark, write to Attorney Smith, in New York, and inclose the copy of the contract of 1851 which they had obtained from Mr. Lothrop, and say:

"We think there are possibilities in this franchise not yet developed or understood by the present owners, as, notice, it nowhere limits the rights to use the streets, etc., to any particular period, and, in the absence of the same, the grant is perpetual, unless the limit is implied from the fact that the guaranty ceases to exist after 50 years. It is substantially the same question which we have in our street-railway litigation, in which we are going to win."

Messrs. Croul and Lewis did not have a copy of this contract when they went to New York city. They took with them only the charter of the company, and a statement showing the profits of the company for several years prior to that time.

Mr. Lothrop is dead, but left, in a letter of August 29, 1893, an emphatic denial of the charge. This letter was written in reply to one from Brennan, Donnelly & Van De Mark setting up these representations. Mr. Lothrop wrote:

"We know that no such representations were ever made."

One Baxter, a gas engineer and superintendent of the Detroit Gas Company, testified to a conversation between Messrs. Croul and Lewis and Mr. John Byrne in regard

to the purchase of this property during the latter part of May, 1892. He heard the conversation, and testified as follows:

"The conversation was in regard to the length of time the charter had to run. Major Byrne stated that we had no charter, and Mr. Lewis said, 'Oh, yes, we have.' 'Well,' Major Byrne said, 'you have only about seven years to run.' Mr. Lewis then made the remark that it would not be much trouble in getting a new charter when the other would expire. There was nothing at all said in regard to the rights in the streets. They spoke about the price of the plant, and Mr. Byrne said they had an option on a piece of property, and had a charter that would run 26 years, and could build a plant much cheaper than the $1,800,000 which was asked for the plant by Mr. Lewis."

Several of the directors of the Detroit Gaslight Company testified that they had never heard of any claim made on behalf of that company that it owned perpetual rights in the streets. After the contract with Weidenfeld was made, Messrs. Croul and Lewis wrote letters to the stockholders, advising them to ratify it and sell their stock under its terms, because their charter had but a short time to run, and other parties had threatened to build another plant in competition with their company. This threat on the part of Weidenfeld and his associates is fully established. Messrs. Croul and Lewis did not become connected with the Detroit Gaslight Company until about 22 years after the date of the contract of 1851, and Mr. Lothrop not until 1885. There is nothing in this record to indicate that there was any occasion for them to examine the old records of the company or of the common council proceedings to ascertain what contracts had been made between the city and the company. We do not hesitate, under this record, therefore, to conclude that the representations claimed were not made, and that Lewis and Croul at that time had no knowledge of the contract of 1851.

6. We think it also fully established by the evidence that Weidenfeld and his associates did not rely upon the

representations alleged to have been made by Croul and
Lewis.  Mr. John Byrne testified that, when Mr. Croul
made his statement in regard to the rights of the company
in the streets, Weidenfeld said:

"'Well, that is a question we don't care to discuss here,
because we always refer these things to our lawyers.
We will leave that question to the lawyers to determine,—
about your rights.'  I said: 'Very well.  Now, gentle-
men, what do you ask for this property?'"

They acted in accordance with the above statement, and
referred the matter to their attorneys in Detroit.  These
attorneys applied to Mr. Lothrop "for such information
as he had."  He replied by referring them to, and at their
request giving them a copy of, the contract of 1851, with
the guarded statement that that was all he knew anything
about.  It is conceded that Mr. Lothrop was an honest,
upright, and careful man.  He suppressed no fact, and
did not intend to.  They had no right to assume that this
contract was all there was, and Mr. Lothrop did not state
or intimate that it was.  They were notified by a perusal
of that document that certain features of it existed for 10
years only, and that it was entirely probable that other
arrangements were then made.  The records of the com-
mon council were in a building close by, and open to their
inspection.  So, also, the records of the Detroit Gaslight
Company were undoubtedly at their disposal for examina-
tion, had they seen fit to ask it.  A brief examination of
these would have discovered the contract of 1861 and
other documents.  If they chose to rely upon that con-
tract, it was at their own risk.  They had neither received
any misinformation, nor had they been misled by any
statement of Mr. Lothrop.  There was no suppression of
any facts which Mr. Lothrop was bound to know and in-
form them of.  If it were a fact that these parties relied
upon representations of the extraordinary claim that this
company had rights perpetual, and which would exist
beyond the chartered life of the corporation, certainly
common prudence would have warned them to examine

the records at their command to determine whether those alleged rights had been affected by any other action between the city and the corporation.

In conclusion, we may add that the defendants are without equities. They purchased the property of the Detroit Gaslight Company at a figure at which it had been, and then was, exceedingly profitable. The stock of the Michigan Gas Company was exceedingly low. That company was threatened with a failure of the supply of natural gas, and desired and needed a plant for the manufacture of artificial gas to supply its customers and make it profitable. Mr. Weidenfeld had purchased and procured the assignment to himself of all the stock of the Detroit Gaslight Company. Its directors had resigned, and, as they resigned, others, in the interests of Weidenfeld and his associates, were elected to take their places. They then organized the new company, the defendant gas company. The three old companies were then sold and transferred to the new company upon the basis of the following figures: The Detroit Gaslight Company, $1,450,-000; the Mutual Gas Company, $1,250,000; the Michigan Gas Company, $3,500,000, the latter company having cost but $1,800,000. They then capitalized this new company at $4,000,000 and issued bonds to the amount of $4,000,000 more, $2,000,000 of which were sold, and the other $2,000,000 held in reserve. Almost immediately suit was commenced by the city, attacking the legality of this organization. As above stated, neither the complainants, nor the stockholders whom they represented, nor the Detroit Gaslight Company, were notified or asked to defend that suit. The defendant company settled it with the city without the knowledge or advice of the complainants or those whom they represented. They obtained a new franchise for 30 years, and agreed upon the price of gas at a rate at which it is furnished by several other cities; and one of those who negotiated this franchise on the part of the defendant company stated that the franchise was worth a million dollars.

Under these circumstances, their cause fails to meet the approval of a court of equity.   For anything that appears upon the record, the new company may be able to manufacture gas under the new ordinance with as much profit as was done under the old.   The proposition to now recoup as damages the difference between the value of the plant as a dead property, with no rights in the streets, and the price agreed to be paid, is wholly unjust and inequitable.

Other important and interesting questions are presented by this record, but, inasmuch as the above conclusion disposes of the case, we refrain from discussing them.

The decree is affirmed, with costs.

The other Justices concurred.